# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WATERLOO DIVISION

IZET TAHIROVIC,

    Claimant,

    vs.

ANDREW M. SAUL,

Commissioner of Social Security,[1]

    Defendant.

No. 18-CV-2085-LRR

**REPORT AND RECOMMENDATION**

---

    Claimant Izet Tahirovic ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. Sections 401-34 and for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. Sections 1381-85. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that he was not disabled. For the reasons that follow, I recommend that the District Court **affirm in part and reverse and remand in part the Commissioner's decision.**

## I.     BACKGROUND

    I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 12) and only summarize the pertinent facts here. Claimant was born on April 8, 1968. (AR[2] at

---

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit.

[2] "AR" cites refer to pages in the Administrative Record.

211.)  Claimant has a twelfth grade education.[3]  (*Id.* at 33.)  Claimant is unable to read or write in English.  (*Id.* at 21.)  He allegedly became disabled due to "shoulder pain, neck pain, heart, cholesterol, high blood pressure, and headaches."  (*Id.* at 268 (punctuation added, spelling corrected).)  Claimant's alleged onset of disability date was July 5, 2011.  (*Id.* at 211, 213.)  Claimant filed applications for Social Security disability benefits and SSI on September 8, 2015 and October 23, 2015, respectively.  (*Id.* at 211-21.)  Claimant's claims were denied initially and on reconsideration and Claimant filed a request for hearing.  A video hearing was held on December 18, 2017.  (*Id.* at 29.)  Claimant and his attorney, Hugh Field, appeared in Waterloo, Iowa and ALJ Michael Lee Larner and vocational expert ("VE") Melinda Stahr appeared in West Des Moines, Iowa.  (*Id.* at 29-54.)  Bosnian interpreter Asrah Sikovic was also present, but the record does not indicate in which city the interpreter appeared.  Claimant and the VE testified.  (*Id.* at 36-53.)

The ALJ entered a partially favorable decision on March 13, 2018.  (*Id.* at 9-23.)  On April 16, 2018, Claimant filed a Request for the Appeals Council to review the ALJ's decision.  (*Id.* at 207-09.)  On September 4, 2018, the Appeals Council found there was no basis to review the ALJ's decision.  (*Id.* at 1-3.)  Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner.  *See* 20 C.F.R. § 416.1481.

On November 8, 2018, Claimant timely filed his complaint in this Court.  (Doc. 4.)  The case was ready for decision on July 23, 2019.  (Doc. 16.)  On that date, the Honorable Linda R. Reade, United States District Court Judge, referred the case to me for a Report and Recommendation.

---

[3] I assume this education is from Bosnia because Claimant does not read or write in English.

## II. DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v.*

*Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is

responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A. *The ALJ'S Findings*

The ALJ made the following findings at each step of the five-step process regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since July 5, 2011, the alleged onset date. (AR at 15.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: "degenerative joint disease of the left shoulder; degenerative disc disease of the cervical and lumbar spine; obesity; and depression." (*Id.* at 15-16.) The ALJ also found that Claimant had the following nonsevere impairments: "carpal tunnel syndrome status-post surgery; paroxysmal supraventricular tachycardia status-post ablation procedure; hypertension; and hyperlipidemia." (*Id.* at 16.)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations. (*Id.*) Specifically, the ALJ considered Claimant's symptoms

5

under listings 1.00 (musculoskeletal system disorders) and 12.04 (depressive, bipolar, and related disorders). (*Id.*)

> At step four, the ALJ found that Claimant had the following RFC:
>
> [He could] perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the ability to occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, but never climb ladders, ropes, or scaffolds or crawl; he could occasionally reach over head with the left upper extremity and frequently handle and finger with the left upper extremity; and he is limited to simple, routine tasks.

(*Id.* at 16-17.) The ALJ also found that Claimant was unable to perform any of his past relevant work. (*Id.* at 20.) The ALJ further found that prior to his disability onset date, Claimant was a younger individual aged 18-49. (*Id.*) The ALJ applied Social Security Administration's ("SSA's") age categories "non-mechanically" and considered "the additional adversities" in the case to decide that Claimant's age category changed on December 31, 2017 to an individual closely approaching advanced age. (*Id.*) (citing 20 CFR 404.1563; 416.963).[4]

At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Claimant could perform prior to December 31, 2017, including maid/housekeeper, marker, and small products assembler (*Id.* at 22.) Therefore, the ALJ concluded that Claimant was not disabled prior to December 31,

---

[4] The ALJ explained that a "borderline age situation" existed because Claimant was "within a few days to a few months of attaining the next higher age category and applying the chronological age would result in a denial of the Title II and XVI claims." (AR at 21.)

> Specifically, the claimant's 50th birthday is April 7, 1968 for Social Security Administration purposes. At age 50, the claimant would grid based on the residual functional capacity set forth above. In addition, the date last insured expired on December 31, 2017, less than four months before the claimant's change in age. Use of the next higher age category is supported by the significant adverse impact of all factors on the claimant's ability to adjust to other work.

(*Id.*)

2017. (*Id.*) However, the ALJ concluded that Claimant was disabled beginning December 31, 2017 through the date of his decision. (*Id.*)

## B.    *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

7

## III.    DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) failing to provide good reasons for the weight afforded to Dr. Manshadi's opinion; (B) failing to resolve the apparent conflict between Claimant's English illiteracy and the jobs upon which the ALJ relied to deny benefits; and (C) failing to provide good reasons for the weight afforded to the Claimant's subjective complaints.  (Doc. 13 at 1.)

### A.    *The ALJ did not provide good reasons for the weight afforded Dr. Manshadi's opinion.*

#### 1.    *Dr. Manshadi's Relationship to Claimant*

Dr. Farid Manshadi treated Claimant from 2006 to 2009 for shoulder injuries related to a car accident and treated him again beginning in 2015 for his on-going shoulder issues.  (AR at 399-400, 513-17.)  Therefore, although Dr. Manshadi provided his opinion in the capacity of an examining and evaluating physician regarding Claimant's work limitations, Claimant calls Dr. Manshadi his treating physician.  The Commissioner does not directly dispute this characterization, but does call Dr. Manshadi "examining physiatrist Farid Manshadi, M.D."  (Doc. 14 at 6.)

To the extent the parties have a dispute over this issue, I find that Dr. Manshadi is Claimant's treating physician.  Claimant began seeing Dr. Manshadi in 2006 due to shoulder injuries sustained in an automobile accident.  (AR at 399-400.)  Claimant continued to see Dr. Manshadi for treatment of shoulder pain into 2009.  (*Id*. at 400.)  Dr. Manshadi mentions that history in his opinion.  (*Id*. at 402.)  Dr. Manshadi did not treat Claimant for the work injury that led to his current shoulder problems, but treated him again beginning in June 2015.  (*Id*. at 517.)  He saw Claimant five times in the next five months until he referred Claimant to Dr. Delbridge for surgery because Claimant was still in "a significant amount of pain."  (*Id*. at 513.)  At that point, Claimant was to return to Dr. Manshadi on an as-needed basis.  (*Id*.)

8

### 2. Dr. Manshadi's Opinion

Dr. Manshadi examined Claimant on August 1, 2014 and wrote his opinion on October 27, 2014. (*Id.* at 398.) He opined, in pertinent part, that Claimant was limited to occasional handling and fingering with his left hand. (*Id.* at 404.) The ALJ did not assess Dr. Manshadi's opinion. Rather, he merely mentioned it as a Functional Evaluation Report that was reviewed by the state agency physician, Marlene Ann Gernes, D.O. (*Id.* at 19.) Thus, he did not give the report any specific weight or even evaluate it separately from this mention.

Dr. Gernes, on the other hand, concluded that Claimant could frequently handle and finger with his left hand. (*Id.* at 80.) Dr. Gernes's opinion was affirmed on reconsideration by Dr. John May on May 9, 2016, who also reviewed Claimant's records for the state agency. (*Id.* at 119.) The ALJ included frequent handling in Claimant's RFC. (*Id.* at 17.)

### 3. Analysis

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record as a whole.[5] *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quotation omitted). An ALJ must "give good reasons" for the weight given to a treating physician's opinion. *Walker v. Comm'r, Soc. Sec. Admin.*, 911 F.3d 550, 553 (8th Cir. 2018); 20 C.F.R. § 404.1527(c)(2). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v.*

---

[5] Under current regulations, a treating physician's opinion is entitled to no special deference. *See* 20 C.F.R. § 404.1520c(c). These regulations were effective as of March 27, 2017. *See* 20 C.F.R. § 404.1527. However, Claimant's claims was filed in 2015. Thus, the old regulations apply. *See id.*

*Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted)). In so doing, an ALJ must "evaluate every medical opinion [he or she] receive[s]." 20 C.F.R. § 404.1527(c). "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7.

Claimant argues that the ALJ improperly weighed Dr. Manshadi's opinion because the ALJ did not provide good reasons for the weight he afforded to the opinion. (Doc. 15 at 10.) The Commissioner responds that Claimant has failed to show any harm from this alleged error because "a reasonable mind could determine that the ALJ gave [Dr. Manshadi's opinion] no weight." (Doc. 14 at 6.) The Commissioner further asserts that "while the ALJ did not explicitly state the weight given to Dr. Manshadi's opinion, his discussion of the evidence clearly shows that he rejected the opinion." (*Id.* at 7.)

For support, the Commissioner relies on *Kresyman v. Astrue*, No. 09-00507-CV-W-NKL, 2010 WL 670248 (W.D. Mo. Feb. 22, 2010), which held that an ALJ properly weighed all the medical opinions in the record, in spite of not assigning weight to each opinion:

> [T]hroughout his opinion, the ALJ's detailed examination of the medical record made clear the weight he afforded to the medical opinions. When the ALJ did not believe that the evidence supported a medical opinion, such as the opinions rendered by Dr. Moore and Dr. Garner, the ALJ explained why he did not find the opinion to be consistent with the evidence. Similarly, when the ALJ discussed medical opinions supported by the evidence, the ALJ explained why he found the opinions persuasive.

*Id.* at *5. Unlike *Kresyman*, the ALJ in this case did not provide a "detailed examination of the medical record" that made clear the weight he afforded the medical opinion. Rather, the ALJ only mentioned Dr. Manshadi's opinion in the context of addressing Dr. Gernes's opinion. The parties' dispute concerns Claimant's ability to handle and finger.

The Commissioner cites to places where the ALJ cites medical evidence related to Claimant's shoulder pain. (Doc. 14 at 9.) The most relevant citation is a treatment note from Dr. Delbridge, who performed left hand carpal tunnel release surgery on Claimant. (Doc. 14 at 9.) The Commissioner notes that Dr. Delbridge stated that Claimant was "able to extend the fingers and bring his fingers back to the palm," which the ALJ asserts undermines Dr. Manshadi's opinion that Claimant can only handle and finger occasionally with his left hand. (*Id.*) I find that this note does not support the Commissioner's conclusion.

Nonexertional limitations can affect a claimant's abilities to, among other things, "seize, hold, grasp, or turn an object (handle). . . ." SSR 85-15, 1985 WL 56857, at *2. Being able to open and close one's hand does not indicate an ability to seize, hold, grasp, turn, or handle an object. These are fine motor skills that are not apparent from the pages cited by the Commissioner in his brief or from the broad range of pages cited by the ALJ. (*i.e.*, citing Hr'g Exs. 7E, 8E, 1F-8F, a total of 396 pages without pinpoint citations).

Dr. Manshadi provided the only examining opinion regarding Claimant's use of his left hand. He based his opinion on his own objective testing of Claimant's left hand, which indicated loss of sensation in Claimant's left thumb and third digit. (AR at 402.) Dr. Manshadi also reviewed "copious" treatment notes while writing his opinion, including treatment notes that indicated that Claimant was having issues with the fingers of his left hand beginning as early as August 2011. (*Id.* at 399 (describing a "pins and needles sensation" in digits 1 and 3 of his left hand).) The ALJ was not entitled to "entirely overlook[] the opinions of an examining medical doctor whose opinions directly

11

addressed" Claimant's fingering and handling limitations. *Kesterson v. Comm'r of Soc. Sec.*, No. 18-CV-2048-LRR, 2019 WL 5586559, at *4 (N.D. Iowa July 29, 2019).[6]

I find also that that the Commissioner has not demonstrated that any error the ALJ committed by failing to assign weight to Dr. Manshadi's opinion was harmless. As discussed, the parties are at odds over Claimant's fingering and handling abilities. The ALJ only mentions these words in his decision five times: 1) In his RFC statement; 2) when discussing Dr. Gernes's opinion; 3)when stating that Dr. Gernes reviewed Dr. Manshadi's opinion; 4) when discussing Dr. May's affirmance of Dr. Gernes's opinion; and 5) when discussing the VE's experience with fingering and handling restrictions. (AR 17-20, 22.) The ALJ never discussed any medical records related to Claimant's fingering or handling restrictions or to the pain, numbness, or tingling Claimant felt in the fingers of his left hand. (*E.g. id.* at 367, 369, 900, 901.)

Although the ALJ gave great weight to the opinions of the state agency physicians because he found them supported by the medical evidence in the record, none of the medical evidence cited by the ALJ or the state agency physicians refers to Claimant's abilities to handle and finger, except for a notation that Claimant underwent carpal tunnel release surgery in late September 2017, was "doing pretty well," and was referred for physical therapy at his next appointment when his stitches were removed. (*Id.* at 898-99.) While these treatment notes hold the promise of Claimant being able to use his hands without pain, they do not state that Claimant is free of pain when using his hands. In fact, these notes are also cited by the Commissioner. At most, they show only Claimant's ability to bring his fingers back to his palm. Up until that point, the ALJ seems to have conflated Claimant's relatively benign objective shoulder examinations

---

[6] This opinion supports the need for remand even if Dr. Manshadi is considered merely an examining physician rather than a treating physician.

with a lack of handling and fingering problems, which was not necessarily the case. Had the ALJ treated Dr. Manshadi's opinion as a treating source (or even an examining source) opinion, evaluated it properly, and given it the attention it deserved, rather than relying on the opinions of Drs. Gernes and Mays, the outcome very well might have been different for Claimant, especially because handling and fingering limitations are a mandated part of the RFC assessment.

I recommend the District Court remand the case for the ALJ to examine Dr. Manshadi's opinion as the opinion of a treating physician, focusing, especially on his opinion concerning Claimant's fingering and handling limitations. *See Walker*, 911 F.3d at 554 (remanding case because, although ALJ made references to the claimant's treating physician, he never mentioned the treatments or restrictions the physician recommended and gave no reasons for rejecting the opinion—ALJ "failed to acknowledge [the] opinion at all").

## B. *The ALJ could rely on the VE's testimony regarding other work Claimant could perform.*

To show that significant numbers of jobs exist that a person with the claimant's RFC can perform, an ALJ "may rely on a vocational expert's response to a properly formulated hypothetical question." *Sultan v. Barnhart*, 368 F.3d 857, 864 (8th Cir. 2004). However, "VE testimony that conflicts with the *DOT*[7] does not constitute substantial evidence upon which the Commissioner may rely to meet the burden of proving the existence of other jobs in the economy a claimant can perform." *Moore v. Colvin*, 769 F.3d 987, 990 (8th Cir. 2014) (quotation omitted). "If there is an 'apparent unresolved conflict' between VE testimony and the *DOT*, the ALJ must 'elicit a reasonable explanation for the conflict' and 'resolve the conflict by determining if the

---

[7] *Dictionary of Occupational Titles*

explanation given [by the expert] provides a basis for relying on the [VE] testimony rather than on the *DOT* information.'" *Id.* at 989-90 (quoting SSR 00-4p, 2000 WL 1898704, at **2-4) (brackets in original).

Claimant argues that the ALJ did not resolve the apparent conflict between his illiteracy in the English language and the reading and writing requirements of the jobs identified by the VE. (Doc. 13 at 5-6.) For support, Claimant cites *Closson v. Astrue*, No. C 06-4095-MWB, 2008 WL 504013 (N.D. Iowa Feb. 21, 2008). *Closson* reversed an ALJ's decision regarding the jobs a claimant could perform at step 5. *Id.* at *10. *Closson* held that "SR 00-4p places an 'affirmative responsibility' upon the ALJ to ask about potential conflicts and to explain the resolution of the conflict in his or her decision." *Id.* at *9 (quoting SSR 00-4p). *Closson* further stated the following:

> SR 00-4p states:
>
> > In these situations, the adjudicator will:
> > -Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the *DOT*; and
> > -If the VE's or VS's evidence appears to conflict with the *DOT*, the adjudicator will obtain a reasonable explanation for the apparent conflict.
>
> SR 00-4p. Additionally, SSR 00-4p requires the ALJ to "explain in the determination or decision how he or she resolved the conflict." *Id.* Thus, SSR 00-4p essentially creates a tripartite duty upon the ALJ to inquire, resolve, and explain any conflict between the *DOT* and testimony from a VE.
>
> In this case, the ALJ erred in all three duties. The VE provided evidence about "the requirements of a job or occupation" by testifying that Closson could work [in four jobs]. . . . The ALJ, however, failed to ask about any possible conflict between the VE's testimony and the information provided in the *DOT* despite the ALJ's "affirmative responsibility" to do so. Likewise, the ALJ failed to explain how the conflict was resolved in his decision despite his duty to do so. Therefore, exactly like the case in *Renfrow*, "[t]he ALJ did not follow [SSR 00-4p] policy and so erred." 496 F.3d at 920-21. However, unlike the case in *Renfrow*, there is an apparent conflict, and therefore the ALJ's error is not "harmless." *Id.*

14

*Id.* (citations to case record omitted). *Closson* therefore found that because there was "an unrecognized, unresolved, and unexplained conflict between the VE's testimony and the *DOT*," the VE's testimony did not constitute substantial evidence to support the ALJ's decision. *Id.* at \*10. *Closson* further found that because there was no evidence in the record "other than the VE's unexplained testimony" that the work he identified was "of the 'lowest of entry-level type activities'" to rebut the *DOT* classifications or reasonably explain the conflict between the jobs identified and the claimant's RFC that included a limitation to "no requirements for the use of written material or mathematical calculations," the ALJ's decision had to be reversed. *Id.* at \*\*9-10.

The Commissioner responds that the three jobs identified by the VE in this case all have a language development level of 1, which is the lowest level that is assigned to any job. (Doc. 14 at 10 (citing *Lawson v. Apfel*, 46 F. Supp. 2d 941, 947 (W.D. Mo. 1998).) The Commissioner argues that because every job is assigned a language level, to find that "illiterate individuals could not perform Level 1 jobs would mean that illiteracy was a *per se* disability under the *DOT*," which would be "illogical and would directly contradict [SSA] regulations which indicate that a claimant is not disabled simply because he is functionally illiterate." (*Id.* (citing *Lawson*, 46 F. Supp. 2d at 947; 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.16).)

*Lawson*, upon which the Commissioner relies, can be distinguished from the case at bar. In *Lawson*, the ALJ's hypothetical posited to the VE included the limitation that the individual was functionally illiterate. 46 F. Supp. 2d at 946. In holding that the ALJ did not err in relying on the VE's opinion, the court reasoned that because the hypothetical included this limitation, it could "assume that the VE specifically limited his opinion to reflect appropriate jobs." *Id.* (citing *Whitehouse v. Sullivan*, 949 F.2d 1005, 1006 (8th Cir. 1991)) ("the ALJ specifically asked the expert to assume a job applicant with [plaintiff's] age, education, work experience, and residual functional capacity . . . the

ALJ could properly assume that the expert framed his answer based on the factors the ALJ told him to take into account.") (ellipses in original).

In the case at bar, in spite of finding Claimant "is considered in the same way as an individual who is illiterate in English," the ALJ did not include a language limitation in the RFC. (AR at 116-17, 21.) The ALJ only limited Claimant to "simple, routine, tasks." (*Id.* at 17.) The VE also noted in her testimony that there were no language restrictions in the RFC. (*Id.* at 52 ("So I haven't put any—you haven't put any restriction on language at all.").) Thus, in spite of the VE's jobs requiring language development level 1, which is the lowest level, there was no indication at the hearing that the jobs were appropriate for someone who is illiterate in the English language.

Level 1 language development is characterized by the following skill level development:

> **Reading:**
> Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute.
> Compare similarities and differences between words and between series of numbers.
> **Writing:**
> Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.
> **Speaking:**
> Speak simple sentences, using normal word order, and present and past tenses.

U.S. Dept. Labor, DOT, App. C, *Components of the Definition Trailer*, https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM (emphasis added).

However, it is well-recognized that "not all of the jobs in every category have requirements identical to or as rigorous as those listed in the *DOT*." *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000). Rather, *DOT* job descriptions are "are simply generic job descriptions that offer the approximate maximum requirements for each

16

position, rather than their range." *Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 366–67 (8th Cir. 2007) (quoting *Wheeler*, 224 F.3d at 897 (quoting *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997)). Thus, it is important the VE knows the specific characteristics of the hypothetical individual for whom he or she is identifying jobs. In that way, the VE can tell the ALJ if there are jobs within a specific category that meet the requirements identified by the ALJ. In this case, the VE was not given that opportunity. One of Claimant's arguably most-limiting employment qualifiers was missing from the ALJ's hypotheticals. It makes no difference that there was an interpreter at the hearing or that the ALJ included illiteracy in his final written decision. The VE was not asked to consider illiteracy when she provided job possibilities.

In this way, the case at bar is analogous to *Closson*. Here, the VE provided evidence about a job or occupation by testifying that Claimant could work as a maid or housekeeper, marker, or small products assembler. (AR at 51.) Like the ALJ in *Closson*, the ALJ in this case "failed to ask about any possible conflict between the VE's testimony and the information provided in the *DOT* [regarding language proficiency] despite the ALJ's 'affirmative responsibility' to do so.[8] Likewise, the ALJ failed to explain how the conflict was resolved in his decision despite his duty to do so." *Closson*, 2008 WL 504013, at *9. The VE mentioned the language issue in her testimony, which should have called it to the ALJ's attention, even if the ALJ inadvertently forgot to include the limitation in his hypothetical. (AR at 52.) Thus, I find that the ALJ erred by not fulfilling his duty to resolve a possible conflict between the VE's testimony and information in the *DOT* related to jobs provided by the VE. However, unlike the error in *Closson*, I find

---

[8] The ALJ did ask the VE if her testimony was consistent with the *DOT*, other than testimony related to reaching, handling, and fingering limits, which the VE stated were not addressed in the *DOT* and that she was testifying about based on her professional experience. (AR at 51.) The VE testified that her testimony was consistent with the *DOT*. (*Id.*)

17

that the error in this case was harmless. *See Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (affirming ALJ's decision because error was harmless).

An ALJ must consider the entire record before him when making his decision. *See Scott v. Chater*, 112 F.3d 367, 368 (8th Cir. 1997) ("Judicial review by both the district court and the appellate court is "limited to determining whether there is substantial evidence based on the entire record to support the ALJ's factual findings" and whether the ALJ's decision "was based on legal error.") (citations omitted); *Shelton v. Heckler*, 733 F.2d 589, 591 (8th Cir. 1984) (affirming decision of ALJ because the ALJ "carefully considered the entire record" and substantial evidence supported the ALJ's decision). Moreover, as discussed above, "not all of the jobs in every category have requirements identical to or as rigorous as those listed in the *DOT*." *Wheeler*, 224 F.3d at 897.

In this case, part of the "entire record" included evidence that although all the jobs cited by the VE had language development level 1, two of the jobs' specific task descriptions do not include any reading, writing, or communication requirements. Maid/housekeeping:

> Cleans rooms and halls in commercial establishments, such as hotels, restaurants, clubs, beauty parlors, and dormitories, performing any combination of following duties: Sorts, counts, folds, marks, or carries linens. Makes beds. Replenishes supplies, such as drinking glasses and writing supplies. Checks wraps and renders personal assistance to patrons. Moves furniture, hangs drapes, and rolls carpets. Performs other duties as described under CLEANER (any industry).

DOT, 323.687-014 CLEANER, HOUSEKEEPING (any industry) alternate titles: maid, https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT03A.HTM. None of the duties listed under other cleaner professions involve reading, writing, or communicating. Assembler, small products:

> Performs any combination of following repetitive tasks on assembly line to mass produce small products, such as ball bearings, automobile door

locking units, speedometers, condensers, distributors, ignition coils, drafting table subassemblies, or carburetors: Positions parts in specified relationship to each other, using hands, tweezers, or tongs. Bolts, screws, clips, cements, or otherwise fastens parts together by hand or using hand tools or portable powered tools. Frequently works at bench as member of assembly group assembling one or two specific parts and passing unit to another worker. Loads and unloads previously setup machines, such as arbor presses, drill presses, taps, spot-welding machines, riveting machines, milling machines, or broaches, to perform fastening, force fitting, or light metal-cutting operation on assembly line. May be assigned to different work stations as production needs require or shift from one station to another to reduce fatigue factor. May be known according to product assembled.

DOT, 706.684-022 ASSEMBLER, PRODUCT (machine shop) alternate titles: assembler; erector, https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT07A.HTM. Thus, two of the jobs comply with a requirement that they be appropriate for a claimant who is illiterate in the English language.[9] This is analogous to the facts of *Renfrow*. In *Renfrow*, the Commissioner admitted that the ALJ erred by failing to ask if the VE's testimony was consistent with the *DOT*. 496 F.3d at 921. However, the Commissioner asserted that the error was harmless because there was no conflict between the VE's testimony and the *DOT*. *Id*. *Renfrow* found that the VE "referred to broad categories," rather than the two particular jobs identified by the claimant that had the same names as the categories identified by the VE and affirmed the ALJ's decision because there were jobs within the categories that comported with the claimant's RFC. *Id*. Similarly, here there are jobs that Claimant can perform within the maid/housekeeper

---

[9] These two jobs also provide a significant number of jobs in the national economy, even without the third job. The VE testified that there are 500,000 maid or housekeeper jobs and 250,000 small products assembler jobs in the national economy. (AR at 51.) Thus, even without the marker job, a significant number jobs still exist in the national economy for Claimant.

and assembler, small products categories, even when illiteracy is added to Claimant's RFC.

In addition, although in the abstract there seems to be a disconnect between Claimant's inability to communicate in English and jobs requiring the language proficiency that language development level 1 entails, SSA cases are not decided in the abstract. *Hillier*, 486 F.3d at 367. In *Hillier*, the hypothetical presented to the VE described a person with "an IQ score in the 70s, . . . low average to borderline" who "could understand, remember, and follow concrete instructions" and was limited to "simple, concrete work, either unskilled or semiskilled." *Id.* at 365-66. One of the jobs the VE testified that the claimant could perform, and that the ALJ adopted into his decision, was cashier, which requires level 3 reasoning. *Id.* at 366. The court affirmed the ALJ's decision. *Id.* at 367. The court reasoned that although tension existed in the abstract between only being able to understand, remember, and follow concrete instructions and working as a cashier, the claimant had previously worked as a cashier, which demonstrated her ability to perform a job requiring level three reasoning. *Id.* That evidence, along with the absence of any evidence showing that the claimant's mental capacity had deteriorated since she had worked as a cashier, supported the ALJ's conclusion that the claimant's mental impairments did not preclude her from working as a cashier. *Id.* (citing *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 979 (8th Cir. 2003)) (claimant's work history showed he had worked at jobs with SVP ratings equal to ratings of the two jobs with the highest SVP ratings cited by the VE).

In the case at bar, Claimant formerly worked as a painter, which has a language development level of 1, and a truck driver, which has a language development level of 3. (AR at 39, 49-50.) Thus, Claimant's work history demonstrates he has the ability to perform language development level 1 jobs, especially jobs that do not include reading, writing, and communicating tasks. In addition, as the Commissioner noted, English

language illiteracy is not a progressive condition. (Doc. 14 at 11.) Therefore, Claimant's lack of language capacity has not deteriorated since he worked at his previous jobs. Claimant avers that the Commissioner is "trying to confuse the issue" because in a step five case, whether Claimant was able to find work in the past that accommodated his English-language illiteracy is irrelevant as to whether he can perform other work that exists in the national economy. (Doc. 15 at 2.) This argument is without merit. As discussed above, the ALJ was required to consider the entire record when rendering his decision. This necessarily included Claimant's past work. More importantly, the Eighth Circuit considers claimants' past work when deciding cases at step five. *See Hellier*, 486 F.3d at 364, 367; *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 979 (8th Cir. 2003) (claimant had previously worked at jobs with SVP ratings equal to ratings of the two jobs with the highest SVP ratings cited by the VE and therefore jobs cited by the VE were appropriate). Therefore, I find that the ALJ's decision was supported by substantial evidence in the record as a whole. *See Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision). I recommend that the District Court affirm the ALJ's decision on this issue.

**C.** ***The ALJ did not provide good reasons for the weight afforded to Claimant's subjective complaints.***

Claimant argues that the ALJ failed to make a credibility determination regarding Claimant's claimed limitations with his left arm, "instead finding he was able to occasionally reach overhead with his arm and frequently handle and finger with his left arm." (Doc. 13 at 8.) Claimant asserts that his inability to do anything with his left arm was "the heart of his claim." (*Id.*) Claimant further argues that while "the ALJ discussed and weighed the opinions of the nonexamining medical consultants, [he] did not weight

the opinions of Dr. Manshadi or make a determination as to Mr. Tahirovic's credibility." (*Id.*)

The Commissioner responds that although the ALJ could have been "more explicit" in his decision, "the ALJ's discussion of the evidence shows that he found [Claimant's] subjective complaints inconsistent with the record to the extent that they exceeded the limitations in his RFC finding." (Doc. 14 at 16.) The Commissioner argues that the ALJ properly relied on the opinions of the state agency physicians who found that Claimant's reported limitations were not supported by the medical evidence and on Claimant's own activities, including Claimant's 2017 trip to Bosnia. (*Id.* at 15.)

When a claimant suffers from a severe impairment, but the impairment does not meet or equal a disabling impairment listed in the regulations, the ALJ "will consider the impact of [the claimant's] impairment(s) and any related symptoms, including pain, on [the claimant's] residual functional capacity." 20 C.F.R. § 404.1529(d)(4). This determination involves a two-step process in which the ALJ first decides whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms and then evaluates the intensity and persistence of the claimant's symptoms. *Id.* § 404.1529(b),(c). When evaluating the claimant's subjective complaints during the second step, the ALJ considers the objective medical evidence, the claimant's work history,[10] and evidence relating to the following factors ("the *Polaski* factors"): "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) [the claimant's] functional restrictions." *Polaski v.*

_____

[10] The ALJ did not evaluate or even acknowledge Claimant's work history. A Claimant's work history can be relevant for credibility purposes. *See Buckner v. Astrue*, 646 F.3d 549, 559-60 (8th Cir. 2011) (claimant's sporadic work history properly considered when weighing credibility and deciding claimant's subjective complaints not credible); *Wildman v. Astrue*, 596 F.3d 959, 968-69 (8th Cir. 2010) (same).

*Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[11]  An ALJ is not required to "methodically" discuss each *Polaski* factor as long as the ALJ "acknowledge[es] and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (*citing Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

If an ALJ rejects a claimant's subjective complaints, "the ALJ must make an express credibility determination, detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the *Polaski* factors." *Beckley v. Apfel*, 152 F.3d 1056, 1060 (8th Cir. 1998) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir.1991)); *Young v. Apfel*, No. C99-3050, 2000 WL 34031792, at *18 (N.D. Iowa Sept. 1, 2000) (quoting same admonition of the *Beckley* court) (citations omitted).  However, "[i]f the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to its judgment even if every factor is not discussed in depth." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (citation omitted).

In the case at bar, the ALJ mentioned *Polaski* (AR at 17), but made no attempt to conduct a proper *Polaski* analysis or to explain when or if he was addressing or discounting Claimant's subjective complaints.

### 1.     The ALJ properly acknowledged and examined the objective medical evidence.

The Commissioner relies heavily on the ALJ's mentions of objective medical evidence and the treatment notes in the record to argue that the ALJ properly evaluated Claimant's subjective complaints.  Indeed, the ALJ mentioned objective medical evidence

---

[11] The Code of Federal Regulations includes the additional factors of: (1) other treatment the claimant receives for pain relief; and (2) measures the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." 20 C.F.R. § 404.1529(c)(3)(v), (vi).

23

almost exclusively in his decision, including some medical evidence that did not support his decision. (AR at 18-20.) However, it is difficult to ascertain whether the ALJ is relying on the evidence or merely reciting the objective medical evidence as part of his explanation of the evidence that the reviewing physicians examined. In addition, the ALJ's citations to the administrative record are unhelpful. For example, one citation is to hearing exhibits 1F-14F, which translates to pages 336 to 801 of the administrative record: 465 pages. (*Id.* at 19.) This leaves the Court to guess what evidence the ALJ, or perhaps Dr. Gernes in this instance, relied upon. *See Campbell v. Saul*, No. 4:18-CV-0167-DGK-SSA, 2019 WL 3978418, at *4 (W.D. Mo. Aug. 22, 2019) (remanding case for additional explanation of the evidence supporting the ALJ's RFC in order to conduct a meaningful review) (citing *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008) ("providing that the ALJ's opinion must allow for meaningful judicial review")).

Notwithstanding the above, I find that the objective evidence mentioned by the ALJ shows that Claimant's tests indicate mostly normal shoulder structure during the relevant time period. (*Id.* at 19-20.) Given that the ALJ's recitation is in concert with the parties' joint statement of facts (Doc. 12 at 4-12), I find that the ALJ properly acknowledged and examined the objective medical evidence as it related to Claimant's shoulder impairment.

### 2. The ALJ did not properly acknowledge and examine Claimant's Daily Activities.

The ALJ also reviewed some of Claimant's daily activities in his decision. The ALJ noted that Claimant reported in November 2015 that he "could drive, shop in stores, and could count change." (AR at 18.) Claimant also "performed personal care with his right arm, he did household chores with his right arm, . . . [and] was able to lift ten pounds" (*Id.* at 19.) The ALJ also stated that in January 2016, Claimant did not note

any changes in his daily activities.  (*Id.* at 20.)  That is the entirety of the ALJ's evaluation of Claimant's daily activities.  The ALJ never mentioned Claimant's use of his left hand or shoulder.  However, in the November 19, 2015 function report the ALJ cited above, Claimant stated he had pain in his "shoulder that radiates . . . down to my arm and my fingers."  (*Id.* at 283.)

The ALJ did not mention Claimant's inability to use his left arm for household chores, dressing, bathing, grooming, and eating, or the activities Claimant can no longer perform, such as gardening, fixing his cars, and fishing.  (*Id.* at  284-87.)  The ALJ also did not mention Claimant's testimony that, although he did not know if he could work, he did know that he could not use his left arm for any type of work due to pain.  (*Id.* at 46.)

The Commissioner relies on the ALJ's references to Claimant's abilities to drive, shop, and count change, along with Claimant's 2017 trip to Bosnia, and argues that such activities do not support a finding of disability.  (Doc. 14 at 15) (citing AR at 18, 286; *Andrews v. Colvin*, 791 F.3d 923, 929 (8th Cir. 2015)).  I do not agree.

Examining the record as a whole, I find that the Commissioner puts too much weight on these abilities.  In his November 2015 function report, Claimant stated that he shops occasionally, for only 15 minutes at a time.  (*Id.* at 286.)  These brief excursions do not indicate an ability to work and say nothing about Claimant's ability to use his left arm or hand.  Moreover, I find that "counting" change is not the same as handling and fingering coins, if that is the connection the Commissioner is trying to make.  Claimant testified that he is unable to lift his left arm or use his arm to push or pull.  (*Id.* at 43.) He also testified that even after his carpal tunnel surgery, his hand still hurts and he is unable to make a fist "or do much with that hand."  (*Id.*)  Claimant also testified that he has problems fingering, holding things, and not dropping things.  (*Id.*)  Regarding Claimant's trip to Bosnia, I find that while a two-month foreign trip might be significant

25

evidence in many disability cases, here, the evidence is not dispositive. Claimant testified that he went to Bosnia to be with his ill mother. (*Id*. at 48.) Claimant did "nothing" while he was there other than spend time with his mother.[12] (*Id*.)

I find that although the ALJ mentioned some daily activities, he did not properly acknowledge and examine Claimant's daily activities.

### 3. The ALJ did not properly acknowledge and examine the dosage, effectiveness, and side effects of medication and other treatments.

Although the ALJ stated that Dr. Gernes found that Claimant "failed steroid injections, pain medications, physical therapy, cervical spinal cord stimulator, . . . and arthroscopy with manipulation under anesthesia" (AR at 19), he failed to discuss the repercussions of those failures.[13] The repercussions were a cycle of doctor visits, tests, and unsuccessful treatments and courses of physical therapy. (Doc. 12 at 4-12.) Another repercussion is Claimant's long-term use of opioid medication to help manage his shoulder pain. (AR at *e.g*. 908, 902.) The ALJ noted that Claimant's symptoms improved when he took his medication. (*Id*. at 20.) The Commissioner cites the same November 2016 treatment note that the ALJ apparently relied on, which states that Percocet "seems to help [Claimant's] shoulder and he can get by with that." (Doc. 14 at 8, 15 (citing AR at 908).)

However, it seems that Claimant only "got by" for a couple of months. Two months after Dr. Delbridge wrote that note, Claimant was back in Dr. Delbridge's office with shoulder pain, even though he was on medication continuously. (AR at 906.) Dr. Delbridge continued to document Claimant's increasing shoulder pain over the next seven

---

[12] It also appears that Claimant was in "a lot of pain" for at least some of the time he was overseas because he was unable to fill a Percocet prescription large enough to sustain him for his entire trip. (AR at 902.) Claimant was in pain when he arrived back in the United States. (*Id*.)

[13] Although the ALJ does not state this as his own finding, I assume he adopted it because he gave Dr. Gernes's opinion great weight.

months while Claimant was still on Percocet. (*Id.* at 900-05.) In April 2017, Dr. Delbridge documented pain with range of motion testing. (*Id.* at 903 (noting that "whenever he gets close to past 90 with his shoulders, [Claimant] definitely flinches").) On September 1, 2017, Dr. Delbridge noted that he was going to perform carpal tunnel release surgery on Claimant's left hand and that he was also concerned about Claimant's continued shoulder pain and limited motion. (*Id.* at 900.) Dr. Delbridge planned to reevaluate Claimant's shoulder once his carpal tunnel surgery was done. (*Id.*)

While the ALJ was not required to address every piece of evidence in the record, he was required to address the *totality* of the evidence, which, in this case, indicated that Claimant's shoulder pain was not necessarily being relieved by Percocet. *See Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (holding that "an ALJ is not required to discuss every piece of evidence submitted") (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)); *Holmes v. Astrue*, No. C10-2042, 2011 WL 2580333, at *11 (N.D. Iowa June 28, 2011) (same). The ALJ seems to have unduly focused on one of the two of Dr. Delbridge's treatment notes that document acceptable pain control. (AR at 907-08.) In actuality, nine of twelve notes document pain, most while on Percocet, and one documents "burning" in Claimant's shoulder. (*Id.* at 900-11.) Accordingly, I find that the ALJ failed to properly acknowledge and examine the dosage, effectiveness, and side effects of Claimant's medications and treatments.

### 4. *Conclusion on the ALJ's Credibility Determination*

The objective medical evidence is not a *Polaski* factor. Thus, the ALJ only addressed two *Polaski* factors: Claimant's daily activities and the effects of Claimant's medications, and failed to fully address all the relevant evidence related to these factors, including evidence that detracted from his decision. The ALJ rarely mentioned Claimant's shoulder or hand pain in his decision, even though this pain was clearly Claimant's main impairment. Thus, while a court will "normally defer to the ALJ's

credibility determination," *Halverson*, 600 F.3d at 932, I find it would be inappropriate to do so in this case. *See id.* (a court should defer an ALJ's credibility determination *if* the ALJ "explicitly discredits the claimant's testimony and gives good reasons for doing so") (emphasis added). The ALJ did not give good reasons for discrediting Claimant's testimony or allegations and never mentioned Claimant's credibility. I find this failure to do so was more than a mere drafting error. *See Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir. 1987) (An "arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where . . . the deficiency probably had no practical effect on the outcome of the case."). Accordingly, I find that substantial evidence on the record as a whole does not support the ALJ's credibility determination and recommend that the District Court reverse the ALJ's decision on this issue and remand the case for the ALJ to conduct a proper *Polaski* analysis.

## IV. CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm in part and reverse and remand in part** the decision of the ALJ.

- The Court should **affirm** the ALJ's decision related to work Claimant could perform at step 5 of the five-step process;
- The Court should **reverse** the ALJ's decision related to the weight afforded to Dr. Manshadi's opinion;
- The Court should **reverse** the ALJ's decision related to Claimant's subjective complaints; and
- The Court **should direct the ALJ to do the following on remand:**
  - Assess Dr. Manshadi's opinion as the opinion of a treating source, focusing on his opinion related to Claimant's fingering and handling abilities, assign the opinion appropriate weight, and incorporate this assessment into Claimant's RFC; and
  - Conduct a proper *Polaski* analysis of Claimant's subjective complaints related to Claimant's use of his left arm and hand, and incorporate this analysis into Claimant's RFC.

28

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 3rd day of December, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa